## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 15-13426-BFK |
| DANIEL TODD CAMPBELL, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |

## MEMORANDUM OPINION
## AND ORDER DENYING U.S. TRUSTEE'S
## MOTION TO DISMISS BANKRUPTCY CASE

This matter comes before the Court on the U.S. Trustee's Motion to Dismiss this Chapter 7 bankruptcy case pursuant to 11 U.S.C. §§ 707(b)(2) (the means test) and 707(b)(3) ("abuse"). Docket No. 30. The Debtor filed an Opposition. Docket No. 37 (Response), 38 (Amended Response). The Court heard the evidence on June 10, 2016. For the reasons stated below the Court will deny the U.S. Trustee's Motion.

### Findings of Fact

The Court, having heard the evidence, makes the following findings of fact:

1.      The Debtor, Daniel Todd Campbell, is an attorney. He practices with Crowell and Moring, LLP, in the District of Columbia. He is a graduate of Washington and Lee University School of Law and has an undergraduate degree from the College of William & Mary. He is divorced with one child, custody of whom he shares with his ex-wife.

A. *The Debtor's Income.*

2.        The Debtor earned gross compensation of $343,956.00 in 2013, and $508,668.00

in 2014. UST Ex. 3, Statement of Financial Affairs, Question No. 1. He earned gross

compensation of $383,423.00 in 2015. DR Ex. J.[1]

3.        The Debtor has a base salary and the opportunity for bonus compensation at his

law firm. His recent salary history is as follows:

|        | 2011 | 2012 | 2013 | 2014 | 2015 |
|--------|------|------|------|------|------|
| **Base:** | $336,387 | $353,992 | $343,246 | $329,978 | $328,423 |
| **Bonus:** | $15,000 | --- | --- | $175,000 | $55,000 |
| **Total:** | **$351,387** | **$353,992** | **$343,246** | **$504,978** | **$383,423** |

*Id.*

4.        The Debtor testified that his 2014 bonus was a "one time" event, based on the fact

that he was able to bring a substantial client matter into the firm. He further testified that he spent

the 2014 bonus as follows:

- Federal Income Taxes (Past Due)              $80,000.00

- Virginia Income Taxes (Past Due)             (amount unknown)

- Federal Income Taxes (Due April 2015)        (amount unknown)

- Ocwen (Mortgage Arrearages)                  $26,000.00

- Bank of America (Mortgage Arrearages)        $7,000.00

- Family Counselor                             $5,000.00

- Credit Card                                  $4,500.00

---

[1] For purposes hereof, the Debtor's Exhibits will be referred to as "DR Ex.'s." and the U.S. Trustee's Exhibits will
be referred to as "UST Ex.'s."

- Credit Card                                  $3,000.00

- Auto Lease Payments                          (amount unknown)

- Medical Bills                                (amount unknown)

- Ongoing Mortgage Payments                    (amount unknown)

- Engagement Ring                              $16,500.00

5.      By the Debtor's calculations, he spent approximately 9.5% of the 2014 bonus on a

personal expenditure, the engagement ring, and paid almost 90% of the 2014 bonus to his

creditors.

6.      At the time that he filed his bankruptcy petition on September 30, 2015, the

Debtor did not know whether he would receive a bonus for 2015. He testified that he did not

learn of the 2015 bonus until some time in January 2016. The Debtor further testified that

bonuses are discretionary with the firm and he is not entitled to a bonus at the end of any given

year.

7.      The Debtor testified that he is not expecting a bonus for 2016. In fact, he is

concerned for his position with the firm because his hours are not meeting the firm's annual

billable hour requirement of 1,900 hours.

B.  *The Courtland Road Property.*

8.      The Debtor and his ex-wife purchased the property at 1612 Courtland Road,

Alexandria, Virginia, in 2006. The Debtor came to be the sole owner of the property as a result

of his divorce.[2]

---

[2] The property is actually owned in the name of the Daniel Todd Campbell Trust, a revocable living trust. UST Ex.
22, at p. 750.

9.      There were two mortgages on the Courtland Road property – a first mortgage with Ocwen Loan Servicing, which required monthly payments of $5,039.00 per month, and a second mortgage with Bank of America, which required monthly payments of $1,211.00 per month. UST Ex. 3, Form 22A-2, Lines 33d and 33e. Together, the two mortgage payments totaled $6,250.00 per month. *Id.,* Line 33g.

10.     In mid-2015, the Debtor began investigating the possibility of a short sale of the Courtland Road property. The Debtor, in looking into the process of a short sale, determined that he should consult a bankruptcy attorney. In the words of the Debtor, his bankruptcy filing was "triggered by the short sale process."

11.     The Debtor stopped paying the mortgages on the Courtland Road property in July 2015; the last payment he made was in June 2015. *See* UST Ex. 22 at p. 750.

12.     The Debtor moved into his current residence, an apartment in Alexandria, Virginia, on August 1, 2015. The rent for the Debtor's apartment is $3,600.00 per month, plus utilities. DR. Ex. F. The apartment has two bedrooms and a loft. The Debtor testified that it was important to him to find a safe place for his daughter, as well as to be close to his office in D.C. so that he can work as many hours as necessary with as little commuting time as possible.

13.     Although the move to the apartment cut the Debtor's housing bill roughly in half ($6,250.00 per month versus $3,600.00 per month), the Debtor lost the benefit of the income tax deductions associated with homeownership, specifically, the mortgage interest deduction and the deduction for real estate taxes paid to the local taxing authorities.

14.     In response to an interrogatory from the U.S. Trustee asking "Do you intend to continue to make payments on any loans with respect to this property? [The Courtland Road

4

property]," the Debtor answered: "I do not anticipate making any future payments on any loans associated with the property . . . ." UST Ex. 22 at p. 751.

15.    U.S. Bank, N.A. (for whom Ocwen was the loan servicer), moved for relief from the automatic stay with respect to the Courtland Road property. Docket No. 17. The Court granted this Motion without opposition on November 20, 2015. Docket No. 25.

16.    In addition, the Debtor filed with the Court a document entitled Trustee's Notice of Abandonment, stating: "[a]t the Debtors' request, in order to facilitate a short sale agreement of real estate located at 1612 Courtland Road, Alexandria, VA 22306, the Trustee has determined to abandon such real estate from the estate in accordance with 11 U.S.C. § 554(a) . . . " Docket No. 50. No objections were filed to the Notice of Abandonment and the Court entered an Order approving the abandonment of the property on June 17, 2016. Docket No. 62.

*C. The Debtor's Divorce.*

17.    The Debtor and his former spouse separated in 2011. As noted above, the Debtor remained in the Courtland Road property.

18.    As a result of his divorce, the Debtor's former spouse is entitled to 50% of his quarterly distributions, after deductions for retirement contributions (which the Debtor maintains are mandatory) and payment of the income taxes due on the distribution. DR Ex. G.

19.    This translates to a payment to the Debtor's ex-wife of $4,350.00 per quarter, from his quarterly distributions. UST. Ex. 10, p. 110.

*D. The Debtor's Income Taxes.*

20.    The Debtor's Schedule E indicates that he owes $210,000.00 in income taxes to the Internal Revenue Service and $20,000.00 to the Virginia Department of Taxation. UST Ex. 3 at p. 28.

21.    Before he filed for bankruptcy, the Debtor entered into a payment plan with the IRS, which required him to pay $2,805.00 per month for his 2012 and 2013 taxes. UST Ex. 22 at pp. 752-53. The Debtor testified that this amount will increase as a result of his 2014 income tax debt.

22.    The IRS has filed a proof of claim in this case in the amount of $215,114.71, of which it asserts $174,902.84 is a priority debt under 11 U.S.C. § 507(a)(8). Proof of Claim No. 2-1. The IRS proof of claim indicates that $15,863.00 of its claim is secured, and $199,251.71 is unsecured. *Id.*

23.    The Virginia Department of Taxation has not filed a proof of claim in the case.

*E. The Debtor's Student Loans.*

24.    The Debtor also listed $143,363.00 in presumptively non-dischargeable student loan debt. UST Ex. 3, Sched. F.

25.    Nelnet has filed a proof of claim in the case in the amount of $149,426.30, for the Debtor's student loans. Proof of Claim No. 1-1.

*F. The Debtor's Car.*

26.    The Debtor leases a 2016 Acura MDX for approximately $600.00 per month. He entered into the lease in January 2015. *See* DR Ex. F.

27.    The vehicle lessor, Acura, waived a penalty of $8,000.00 that would have been due on the Debtor's previous car lease had the Debtor not renewed with Acura.

28.    Further, the current lease includes maintenance on the vehicle.

*G.  The Debtor's Bankruptcy Filing and the Means Test.*

29.    The Debtor filed his voluntary petition under Chapter 7 with this Court on

September 30, 2015. Docket No. 1.

30.    The Debtor's Schedule I states that the Debtor has $18,958.33 in gross monthly

income. UST Ex. 3, Schedule I, Line 2. The Debtor acknowledges, however, that this number

(which equates to $227,499.96 in annual gross income) does not include his quarterly

distributions.

*(i)    The Debtor's Means Test.*

31.    The Debtor's means test as originally filed resulted in negative monthly

disposable income of ($8,413.00), and no presumption of abuse. UST Ex. 3, Form 22A-2, Line

39c.

32.    When the quarterly distributions are factored in, the Debtor used an average

monthly income for the six months preceding the bankruptcy on his Means Test of $23,880.03

(equating to $286,560.36). UST Ex. 3, Form 22A-1, Line 2.

33.    The Debtor further acknowledges that his gross income on the Means Test is

understated because he counted his voluntary contributions to his retirement plan ($3,135.25)

twice. UST Ex. 6, p. 72. The Debtor agrees, therefore, that the U.S. Trustee's starting point of

$27,243.30 is the correct number. UST Ex. 4, Official Form 122A-2, Line 1.

34.    The Debtor's Means Test form uses the Local Housing Standard of $2,139.00 for

his rent expense, although as noted above the Debtor is paying $3,600.00 per month in rent. *Id.* at

Line 9.

35.    The Debtor also has taken deductions on his means test form for the Ocwen and

Bank of America mortgages on Courtland Road, totaling $6,250.00. UST, Ex. 3, Form 22-A,

Lines 33d and 33e.

*(ii)    The U.S. Trustee's Pro Forma Means Test.*

36.    The U.S. Trustee submitted a Pro Forma Means Test, which was admitted into

evidence. UST Ex. 4. The U.S. Trustee's form uses $27,243.30 as the Debtor's average monthly

income. *Id*. at Line 2. As noted, the Debtor concedes that the higher number is accurate because

he double counted his retirement contributions of $3,135.25 per month. DR Ex. I.

37.    The U.S. Trustee's Pro Forma Means Test results in positive monthly disposable

income of **$1,199.37,** and a presumption of abuse. UST Ex. 4, Form 122A-2, Line 39c.

38.    The Debtor's and the U.S. Trustee's allowed expenses of $20,741.60 are the

same. UST Ex. 3, Form 22A-2, Line 24; UST Ex. 4, Form 22A-2, Line 24. The U.S. Trustee's

Pro Forma Means Test, however, excludes any deductions for the Ocwen and the Bank of

America mortgages on the Courtland Road property. UST Ex. 4, Form 22A-2, Form 22A-2,

Lines 33d, 33e.

39.    The Debtor asserts that the U.S. Trustee's Pro Forma Means Test contains three

significant errors, all arising out of the income tax consequences of the U.S. Trustee's

adjustments to the Debtor's numbers. First, the Debtor argues that, although the U.S. Trustee

used a higher income number ($27,243.30, as opposed to the Debtor's $23,880.03), the U.S.

Trustee did not increase the Debtor's tax liability resulting from the increase in income. The U.S.

Trustee used the same income tax number in its Pro Forma Means Test ($6,447.60) as did the

Debtor in his Means Test. UST. Ex. 3, Form 22A-2, Line 16; UST Ex. 4, Form 22A-2, Line 16.

Using a federal income tax rate of 33% and a State income tax rate of 5.75% (for a combined tax

rate of 38.75%), the Debtor argues that this increase in income of $3,363.00 per month would result in his having to pay $1,303.16 in income taxes per month.

40.     Second, the Debtor argues that the UST's Pro Forma Means Test did not account for the loss of the mortgage interest deduction and the real estate tax deduction that would result from his decision to abandon (or short sale) the Courtland Road property. On the Debtor's 2014 Tax Return, the Debtor showed $48,887.00 in mortgage interest paid in 2013, and $35,675.00 in 2014. UST Ex. 19, p. 536. Again using a federal income tax rate of 33% and a State income tax rate of 5.75% for a combined tax rate of 38.75%, the Debtor argues that the loss of these deductions results in an increased tax liability (federal and State) of approximately $18,943.71 per year, or **$1,578.64** per month (using the higher, 2013 interest-paid number of $48,887.00; using the lower, 2014 number of $35,675.00, the Debtor would lose $13,824.06 annually, or **$1,152.00** per month).

41.     Third, using the Debtor's real estate tax payment in 2014 of $7,063.00, the loss of the real estate tax deduction would cause the Debtor to have to pay an additional $2,736.91 in income taxes, or **$228.08** per month, using the combined tax rate of 38.75%. UST Ex. 19, p. 543, Line 6. Similarly, using the 2013 real estate tax number of $6,550.00, the Debtor would have to pay an additional $2,538.13 in income taxes, or **$211.51** per month. UST Ex. 18, p. 487.

42.     When questioned on cross-examination whether the foregoing increases in income taxes resulting from the adjustment to the Debtor's income, together with the loss of the mortgage interest deduction and the real estate tax deduction, would eliminate the Debtor's positive monthly disposable income on the means test entirely, the U.S. Trustee's representative answered: "That's fair."

*(iii)*      *The Debtor's Debts.*

43.      Overall, the Debtor's Schedules indicate that he has the following debts:

(a)  Secured Debts (Ocwen and Bank of America) - $892,172.80 (Sched. D);[3]

(b)  Unsecured Priority Claims (IRS and VA) - $230,000.00 (Sched. E);

(c)  Unsecured Non-Priority Claims - $238,298.00 (Sched. F).[4]

UST Ex. 3, Schedules D, E and F.

44.      Given the amount of the unsecured non-priority debt ($238,298.00) and the IRS unsecured priority debt ($199,251.71), the Debtor would not be eligible for relief under Chapter 13. 11 U.S.C. § 109(e) (unsecured debt limit at the time this case was filed of $383,715.00).

*H.  The Debtor's Lifestyle.*

45.      The Debtor lives in a two-bedroom apartment in Alexandria, Virginia. He leases a 2016 Acura MDX.

46.      As noted above, the Debtor spent $16,500.00 on an engagement ring in February 2015, roughly eight months before he filed his bankruptcy petition, the source of which was the 2014 bonus. UST Ex. 13, p. 299.

47.      In August 2015, about a month before he filed for bankruptcy, the Debtor spent $5,675.60 at Lovesac for furniture for his apartment. *Id*. at p. 335. He spent roughly another $1,100.00 ($532.42 and $576.36) in Costco for furniture in September 2015, the month that he filed for bankruptcy. *Id*. at p. 342.

---

[3] The Court is not aware of whether these creditors waived any deficiency in connection with the short sale of this property. If there is a liability, it will be dischargeable. The deadline for filing complaints to determine the dischargeability of debts in this case was January 4, 2016. Docket No. 4. No dischargeability complaints have been filed against the Debtor.

[4] The unsecured non-priority debt includes $143,363.00 in presumptively non-dischargeable student loan debt owed to Nelnet. 11 U.S.C. § 523(a)(8). The balance of the unsecured non-priority debt appears to be for credit cards.

48.     Finally, the Debtor and his fiancé took a vacation to Nassau, Bahamas, in September 2015. His fiancé paid the travel costs. The Debtor paid $1,549.25 in incidental costs at the resort where they stayed. *Id.* at p. 341.

## Conclusions of Law

This Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334 and the Order of Reference of the U.S. District Court for this District entered August 15, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) (matters concerning the administration of the estate).

The U.S. Trustee makes two arguments in support of her Motion. First, she argues that the Debtor does not meet the means test of Section 707(b)(2) and the case should be dismissed unless the Debtor elects to convert his case to Chapter 11 and devotes his disposable income to pay his creditors for a period of five years. Alternatively, the U.S. Trustee argues that the case represents an abuse of the bankruptcy system under the totality of the circumstances. 11 U.S.C. § Section 707(b)(3). The Court will address each of these arguments, in turn.

### I.      Means Testing Under 11 U.S.C. § 707(b)(2).

Section 707(b)(1) of the Code provides that the court may dismiss the case "if it finds that the granting of relief would be an abuse of the provisions of this chapter." 11 U.S.C. § 707(b)(1). Section 707(b)(2) provides that a presumption of abuse arises if debtor does not meet what has commonly become known as the means test of Section 707(b)(2). 11 U.S.C. § 707(b)(2). The means test, enacted as part of the 2005 BAPCPA Amendments to the Code, was designed "to

help ensure that debtors who can pay creditors do pay them." *Ransom v. FIA Card Servs., N.A.*,
562 U.S. 61, 64 (2011), citing H.R.Rep. No. 109–31, pt. 1, p. 2 (2005).[5]

The U.S. Trustee's Motion presents two questions under the means test. The first is
whether in Chapter 7 the Debtor may deduct mortgage payments that he has no intention of
paying. The second question is whether, if the Debtor may not deduct the mortgage payments for
purposes of the means test, this changes the result in this case.

A.  *Whether the Debtor Can Deduct Mortgage Payments that*
     *He Has No Intention of Paying.*

There is no real dispute that the Debtor filed his bankruptcy case in the anticipation of a
short sale of the Courtland Road property, and with no intention of making any further mortgage
payments. The Debtor acknowledged this in his Answers to Interrogatories. UST Ex. 22 at p. 751
("I do not anticipate making any future payments on any loans associated with the property …").
The Debtor testified at the hearing in this matter that the short sale process impelled the
bankruptcy. He has not made a mortgage payment since June 2015. The inescapable conclusion
is that the Debtor had no intention to make any further payments on the two mortgages at the
time that he filed his petition.

Section 707(b)(2) provides that there is a presumption of abuse where the debtor's
current monthly income (defined by Section 101(10A)), reduced by the amounts described in
subsections (i), (ii) and (iii), exceeds a certain amount. 11 U.S.C. § 707(b)(2). Of relevance here,
Bankruptcy Code Section 707(b)(2)(A)(iii) provides that, for purpose of deducting secured debt
payments:

---

[5] The means test applies only to debtors with primarily consumer debts. There is no dispute in this case that the
Debtor's debts, consisting of domestic support obligations, student loan debt, personal income taxes, and credit card
debts, are primarily consumer debts. UST Ex. 2, Voluntary Petition, p. 1 ("Debts are primarily consumer
debts . . . ").

The debtor's average monthly payments on account of secured debts shall be calculated as the sum of—

(I)  *the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the filing of the petition;* and

(II)  any additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts;

divided by 60.

11 U.S.C. § 707(b)(2)(A)(iii) (emphasis added).

The Supreme Court held in *Ransom*, 562 U.S. at 61 (2011), that Chapter 13 debtors may not deduct hypothetical secured debt payments for purposes of the means test where the debtor did not have any actual car payments at the time he filed for bankruptcy. Following *Ransom*, and the Supreme Court's previous opinion in *Hamilton v. Lanning*, 560 U.S. 505 (2010), the Fourth Circuit held that Chapter 13 debtors may not take deductions for secured debt payments where they intend to surrender the collateral. *Morris v. Quigley (In re Quigley)*, 673 F.3d 269 (4th Cir. 2012). The Fourth Circuit has not, however, addressed the issue of whether Chapter 7 debtors may deduct secured debt payments for purposes of the means test where the debtor intends to surrender the collateral.

The issue is illustrated by two well-reasoned bankruptcy court opinions in the Fourth Circuit that reached opposite conclusions: Judge Humrickhouse's decision in *In re Byers,* 501 B.R. 82 (Bankr. E.D. N.C. 2013), and Judge Mayer's decision in *Robbins v. Denzin (In re Denzin)*, 534 B.R. 883 (Bankr. E.D. Va. 2015). In *Byers*, Judge Humrickhouse held that Chapter 7 debtors may not deduct secured debt payments for collateral that they intend to surrender. 501 B.R. at 88. Relying principally on *Quigley*, and to a lesser degree on *Lanning* and *Ransom*, Judge

13

Humrickhouse held that the debtor may not deduct the payments "because § 1325(b)(3)

incorporates the chapter 7 means test by reference." 501 B.R. at 87.

By contrast, Judge Mayer held in *Denzin* that the Chapter 7 debtors could deduct such

payments. 534 B.R. at 888. Distinguishing *Quigley*, Judge Mayer noted that the means test

serves different purposes in Chapter 7 and Chapter 13. *Id*. at 887-88. Judge Mayer held that the

disposable income test in Chapter 13 is forward-looking, while in Chapter 7 is a "static

snapshot." *Id*., at 887. Further noting that the disposable income test of Section 1325(b)(1)(B)

contains the word "projected," whereas Chapter 7's Section 707(b) does not, Judge Mayer held

that the two statutes serve different purposes and therefore should be construed differently. *Id*.[6]

Cases from other bankruptcy courts since the *Byers* decision have reached different

results. *See In re Powers,* 534 B.R. 207 (Bankr. N.D. Fla. 2015) (following *Byers*); *In re Navin*,

526 B.R. 81 (Bankr. N.D. Ga. 2015) (disagreeing with *Byers*); *In re White*, 512 B.R. 822 (Bankr.

N.D. Miss. 2014) (following *Byers*).

The Court concludes that the *Byers* decision has the better view. Section 1325(b)(2)(3)

defines "amounts reasonably necessary to be expended" for purposes of the means test by

reference to Section 707(b)(2), that is, the Chapter 13 disposable income test incorporates the

Chapter 7 means test for purposes of defining the debtor's disposable income. 11 U.S.C. §

1325(b)(2)(3). It would be a curious thing to interpret precisely the same words, in the same

statute (here, Section 707(b)(2) (A)(iii)) differently, depending on whether the case was filed

under Chapter 7 or under Chapter 13. *See Bank of America, N.A. v. Caulkett*, __ U.S. __, 135

S.Ct. 1995, 2000-01 (2015) (Supreme Court is "generally reluctant to give the 'same words a

---

[6] Judge Mitchell of this Court reached the same result in *In re Crawley*, 412 B.R. 777 (Bankr. E.D. Va. 2009). Judge Mitchell's decision in *Crawley* preceded the Fourth Circuit's decision in *Quigley,* and cited the lower court's decision in *Quigley*, which later was reversed by the Fourth Circuit. *Id*. at 783.

different meaning' when construing statutes" (citing *Pasquantino v. United States*, 544 U.S. 349, 358 (2005)). As Justice Scalia noted in his dissent in *Dewsnup*: "We have often invoked the " 'normal rule of statutory construction that " 'identical words used in different parts of the same act are intended to have the same meaning . . . ' That rule must surely apply, *a fortiori*, to use of identical words *in the same section of the same enactment.*" *Dewsnup v. Timm*, 502 U.S. 410, 422(1992) (citations omitted; emphasis in original).

Further, even though Section 1325(b)(1)(B) uses the term "projected disposable income," the portion of the statute at issue in *Quigley* – Section 1325(b)(3) (defining "[a]mounts reasonably necessary to be expended," and incorporating Section 707(b)(2)) - does not use the word "projected;" it simply provides that the term "[a]mounts reasonably necessary to be expended" for purposes of determining "disposable income" under subsection (b)(2) (which also does not use the word "projected") "shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2)," if the debtor is above-median. 11 U.S.C. § 1325(b)(1)-(3).

In the Court's view, *Lanning, Ransom* and *Quigley* are all grounded in making the means test more real-world based, as opposed to a hypothetical or unrealistic result. *See Ransom*, 562 U.S. at 70-71 ("If a debtor will not have a particular kind of expense during his plan, an allowance to cover that cost is not 'reasonably necessary' within the meaning of the statute"); *Lanning*, 560 U.S. at 518 ("The mechanical approach effectively reads this phrase ["income to be received during the applicable commitment period"] out of the statute when a debtor's current disposable income is substantially higher than the income that the debtor predictably will receive during the plan period"); *In re Quigley*, 673 F.3d at 274 ("failing to account for such changes and thereby denying the unsecured creditors payments that the Debtor clearly could make would be just the sort of 'senseless result[ ]' that the *Lanning* Court rejected.") Moreover, it is a misnomer

to say that Section 707(b)(2)(A)(iii) is "static" in Chapter 7 – the statute requires the Debtor to state, and the Court to consider, "the total of all amounts scheduled as contractually due to secured creditors *in each month of the 60 months following the date of the filing of the petition*[.]" 11 U.S.C. § 707(b)(2)(A)(iii) (emphasis added). Congress intended that the court "look forward" in Chapter 13 for purposes of disposable income, but it also intended for the Court to look forward (60 months forward, to be precise) for purposes of whether the presumption of abuse arises in Chapter 7. In this sense, Section 707(b(2)(A)(iii) is "forward looking" in both Chapter 7 and Chapter 13.[7]

The Court views the result here to be compelled by the Fourth Circuit's decision in *Quigley*, interpreting the same statutory language at issue in this case. The Court holds that Chapter 7 debtors may not deduct amounts payable on secured debt where the debtor intends to surrender the collateral and has no intention of making the payments post-petition.

>    B.    *Whether the Presumption of Abuse Arises in This Case.*

The Court turns, then, to the question of whether, notwithstanding the above ruling, the presumption of abuse arises in this case. The Court finds that the presumption of abuse does not arise, despite the disallowance of the mortgage deductions on the Debtor's means test.

The U.S. Trustee's Pro Forma Means Test resulted in **$1,199.37** in monthly disposable income. UST Ex. 4, Form 122A-2, Line 39c. However, the U.S. Trustee did not account for: (a)

---

[7] The means test forms for Chapter 7 and Chapter 13 ask precisely the same question: "Total average monthly payment for all mortgages and other debts secured by your home. To calculate the total average monthly payment, add all amounts that are contractually due to each secured creditor in the 60 months after you file for bankruptcy. Then divide by 60." *See Chapter 7 Means Test Calculation*, United States Courts, Official Form 122A-2 (the Chapter 7 means test form), Line 9b (April 1, 2016), http://www.uscourts.gov/forms/means-test-forms/chapter-7-means-test-calculation, ("Follow Download Form") and *Chapter 13 Calculation of Your Disposable Income*, United States Courts, Official Form 122C-2 (the Chapter 13 means test form), Line 9b (April 1, 2016), http://www.uscourts.gov/forms/means-test-forms/chapter-13-calculation-your-disposable-income,("Follow Download Form"). It is difficult to believe the drafters of the Official Forms intended to elicit different information from debtors by using the same language in the two forms.

the increase in income taxes (**$1,303.16** per month) as a result of using the higher number of $27,243.30 as the Debtor's average monthly income; (b) the loss of the mortgage interest deduction (**$1,152.00** per month, using the lower 2014 mortgage interest number); and (c) the loss of the tax deduction for the Debtor's real estate taxes (**$211.51** per month). These three numbers, totaling $2,666.67, completely offset the U.S. Trustee's monthly disposable income number of $1,199.37 (the disparity is even greater if the higher 2013 mortgage payments are used in the calculation). The U.S. Trustee's witness acknowledged in his testimony that it would be fair to conclude that the disposable income number of $1,199.37 posited by the U.S. Trustee's Pro Forma Means Test would be more than offset by these adjustments.

The Court finds that, notwithstanding its conclusion that Chapter 7 debtors may not deduct the mortgage payments for purposes of the means test, the U.S. Trustee's calculation of the Debtor's disposable income is more than offset by the foregoing adjustments. The Court concludes, therefore, that the presumption of abuse under Section 707(b)(2) does not arise in this case.

## II.    Whether the Case is an Abuse of the Bankruptcy System.

Section 707(b)(1) of the Code provides that the court may dismiss the case "if it finds that the granting of relief would be an abuse of the provisions of this chapter." 11 U.S.C. § 707(b)(1). Under Section 707(b)(3), the Court "shall consider:"

(A)   whether the debtor filed the petition in bad faith; or

(B)   the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

11 U.S.C. § 707(b)(3)(A)-(B). The Fourth Circuit held in the case of *Calhoun v. U.S. Trustee*,

650 F.3d 338, 342 (4th Cir. 2011): "The means test is not conclusive, the presumption is

rebuttable, and a court may still find abuse even if there is no presumption."

In the pre-BAPCPA case of *Green v. Staples (In re Green),* the Fourth Circuit considered

a motion to dismiss under the then-applicable standard of "substantial abuse" under Section

707(b) of the Code. 934 F.2d 568 (4th Cir. 1991). It held that, under Section 707(b), Bankruptcy

Courts should consider the totality of the circumstances, including a debtor's ability to repay a

portion of his or her debts. *Id.* at 573. The Fourth Circuit identified the following factors in

determining whether there was a substantial abuse:

(1)     Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;

(2)     Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;

(3)     Whether the debtor's proposed family budget is excessive or unreasonable;

(4)     Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and

(5)     Whether the petition was filed in good faith.

*Id*. at 572.

The Fourth Circuit held in *Calhoun* that it "need not make a determination as to the

enduring applicability of the holding in *Green*." 650 F.3d at 342. Several Bankruptcy Courts in

the Fourth Circuit, including this Court, have found *Green* to continue to be instructive,

notwithstanding the change in Section 707 from the former "substantial abuse" test to today's

standard of "abuse." *In re Matthews*, No. 13-10521-BFK, 2013 WL 13852221, *8 (Bankr. E.D.

Va. April 3, 2013); *In re Christians,* No. 12-00819-8-SWH, 2012 WL 4846538, at *3 (Bankr.

E.D. N.C. Oct. 10, 2012); *In re Sonntag*, No. 10-1749, 2012 WL 1065482, at *3 (Bankr. N.D. W.

Va. Mar. 28, 2012); *In re Bogart*, No. 11-19089-BFK, 2012 WL 3913093, at *2 (Bankr. E.D.

Va. Sept. 7, 2012), aff'd, Case No. 1:12-cv-1195-GBL-JFA (E.D. Va. 2013); *In re Crawley*, 412

B.R. 777, 785 (Bankr. E.D. Va. 2009) ("the court believes that the factors identified in *Green*

remain relevant considerations").

A number of courts have held that the debtor's ability to pay is the most significant factor

in deciding whether there is an abuse under Section 707(b)(3). *In re Jamarillo*, 526 B.R. 404,

411 (Bankr. D. N.M. 2015); *In re Fox*, 521 B.R. 520, 528-29 (Bankr. D. Md. 2014). More

specifically, though, the courts are concerned with whether the debtor has the ability to repay

some portion of his or her *unsecured debts*, not just priority claims (which often will survive the

debtor's bankruptcy case). *In re Griffin*, No. 13-00574, 2015 WL 350944, *8 (Bankr. D. Alaska

Jan. 22, 2015) ("Debtor has sufficient disposable monthly income to fund a substantial payment

to his unsecured creditors"); *In re Willingham*, 520 B.R. 818, 823 (Bankr. E.D. Cal. 2014)

("When making the 'totality of the circumstances' analysis, the court looks first to the question,

do the Debtors have the ability to pay a substantial portion of their unsecured debts through a

chapter 13 plan?"); *In re Riggs*, 495 B.R. 704, 724 (Bankr. W.D. Va. 2013) ("the Debtors'

'financial situation' does provide them the ability to make a meaningful settlement with their

unsecured creditors . . . "); *In re Holmes*, 496 B.R. 765, 777 (Bankr. M.D. Pa. 2013) ("the Debtor

can fund a Chapter 13 plan which would allow for a significant distribution to his unsecured

creditors"). Priority debts, such as the tax claims in this case, ordinarily are deducted in deciding

whether there can be a meaningful distribution to unsecured creditors. *See In re Tropper,* No. 09-

76151-WHD, 2010 WL 9012919, at *9 (Bankr. N.D. Ga. July 19, 2010) ("the Debtors could pay

their priority tax debt and a significant amount towards their remaining unsecured debt within a

19

reasonable amount of time"); *In re Brady*, 419 B.R. 479, 487 (Bankr. M.D. Fla. 2009) ("after

subtracting the priority unsecured debt from their disposable income . . . ); *In re Allen*, 411 B.R.

913 (Bankr. S.D. Ga. 2009) ("after subtracting the $15,358.14 in priority unsecured debt . . . ").

The Court will address the totality of the Debtor's circumstances, below.

A.   *The Reasons for the Debtor's Bankruptcy.*

It is clear that the Debtor's petition was not filed because of any sudden illness, loss of

employment or other catastrophic event in the Debtor's life. Rather, the Debtor decided that as a

part of the short sale process, he would file for bankruptcy to discharge whatever debts he could

discharge, such as the credit card debts and any deficiency that might not be forgiven as a part of

the short sale (or, if he could not complete a short sale, as a result of a foreclosure). Of course,

many bankruptcies are filed not as the result of a sudden, catastrophic event in the debtors' lives.

Rather, many Chapter 7 consumer bankruptcies are the result of the debtor's exhaustion with the

collection process. Many debtors simply say "enough is enough," and there's nothing to suggest

bad faith about that. Thus, if a debtor has suffered sudden illness or loss of employment it may

favor the debtor under the totality of the circumstances, but if the debtor has not suffered a

catastrophic event pre-petition it will not work against her.

This factor neither favors nor weighs against the Debtor in this case.

B.   *Accuracy of the Schedules and Financial Information.*

There has been no attempt to conceal any property or assets here. The Debtor's Schedules

and Statement of Affairs were largely accurate, with one notable exception – the Debtor's gross

income on his Schedule I was understated because he did not include his quarterly draws. UST

Ex. 3, Schedule I, Line 2. The Court agrees that in most cases year-end bonuses are not

predictable and are paid at the discretion of the employer, so they need not be included in

20

Schedule I. However, the Debtor in this case had an established history of receiving quarterly

distributions; he used the quarterly distributions as a means to pay his former spouse through

direct deposits to her bank account. This factor weighs against the Debtor (though, as discussed

below, may not be so critical as to dictate the outcome of the case).

   *C.  Lifestyle Issues.*

   The Debtor does not live an extravagant lifestyle. He lives in a two-bedroom apartment

with his daughter (half of the time). He signed a lease for an Acura MDX in January 2015, but he

testified that this saved him the lease cancellation charge from a previous vehicle lease (roughly

$8,000.00) and he testified that the new vehicle lease includes maintenance on the car. The

applicable standards for vehicle ownership ($517) and operating costs ($244) from the means

test, combined, are more than the $600.00 that the Debtor is spending on this vehicle lease. *IRS*

*Local Transportation Expense Standards-South Census Region*, The United States Department

of Justice, U.S. Trustee Program (May 15, 2015-Oct. 31, 2015),

https://www.justice.gov/ust/eo/bapcpa/20150515/bci_data/IRS_Trans_Exp_Stds_SO.htm.

   The Debtor took a vacation in the Bahamas in the month that the bankruptcy was filed.

He did not, however, pay the travel costs. Rather, he paid for out-of-pocket expenses at the resort

at which he and his fiancé stayed.

   The engagement ring, which the Debtor purchased for $16,500.00 in February 2015,

certainly has to be characterized as a luxury good. However, even this purchase has to be put into

context. The Debtor just received an extraordinary bonus of $175,000.00 for 2014. As the Debtor

testified, he was feeling as optimistic at that point as he had in years about his financial

condition. Further, upon receipt of the bonus, the Debtor spent 90% of the money on his

creditors. The purchase of the ring weighs against the Debtor, but in the Court's view, the fact

that the Debtor spent 90% of the 2014 bonus on creditor payments weighs heavily in the

Debtor's favor.

D.  *The Debtor's Ability to Repay his Unsecured Creditors.*

Finally, the Court turns to the most significant factor – whether the Debtor has the ability

to repay a meaningful distribution to his unsecured creditors in a Chapter 11 plan. What

constitutes a "meaningful" distribution has been the subject of some discussion in the case law.

*See In re Navin,* 548 B.R. 343 (Bankr. N.D. Ga. 2016) (50% distribution was meaningful); *In re*

*Wiseman,* 514 B.R. 539 (Bankr. S.D. Ohio 2014) (distribution of 45% to 69.5% was

meaningful); *In re Pittman*, 506 B.R. 496 (Bankr. S.D. Ohio 2014) (24% distribution was

meaningful); *In re Hodge*, No. 12-35236, 2014 WL 1419852, at *5 (Bankr. N.D. Ohio April 11,

2014) (distribution of 26% was meaningful); *In re McDowell*, No. 12-31231, 2013 WL 587312,

at *13 (Bankr. S.D. Tex. Feb. 14, 2013) (distribution of 17% was meaningful); *In re Christians*,

No. 12-00819-8-SWH, 2012 WL 4846538, at *8 (Bankr. E.D. N.C. Oct. 10, 2012) (40%

distribution was meaningful); *In re Dupuy,* 433 B.R. 226 (Bankr. S.D. Ohio 2010) (16%

distribution was meaningful); *In re Crawley*, 412 B.R. at 789-90 (Bankr. E.D. Va. 2009)

(distribution of 22% - in Chapter 11 – was meaningful); *In re Phillips,* 417 B.R. 30 (Bankr. S.D.

Ohio 2009) (30% distribution was meaningful); *In re James*, 414 B.R. 901 (Bankr. S.D. Ga.

2008) (24.5% distribution was meaningful).

As discussed below, the issue in calculating the potential distribution to the unsecured

creditors in this case comes down to which gross income number to use. The U.S. Trustee uses

$31,951.92, which is the Debtor's gross income from 2015, including his year-end bonus of

$55,000.00, divided by 12. UST Ex. 6, Schedule I, Line 2. The Debtor argues, on the other hand,

that the starting number for the Debtor's gross income should be $27,368.58 – the Debtor's base

22

salary of $328,423.00 divided by 12, but excluding the $55,000.00 bonus. *See* UST Ex. 8 at p.

81. The Debtor argues that the bonus was unexpected, was unknown at the time that he filed for

bankruptcy and was discretionary with his employer. There is no easy answer to this question

and, as seen below, the choice will determine the outcome of the U.S. Trustee's Motion.

*(i)      Using the Debtor's Figure of $27,368.58.*

Using the Debtor's income number of $27,368.58, the Debtor's income increases by

$8,410.25, from his stated $18,958.33. Using a 38.75% combined tax rate, his monthly net

income would increase after the payment of taxes by **$5,151.28.** The Debtor's expenses would

decrease by the combined amount of the two mortgages, $6,250.00, for a total positive increase

in net income of **$11,401.28** ($5,151.28 + $6,250.00). When applied against the Debtor's stated

Schedule J monthly net income (-$7,810.01), this would result in positive monthly net income of

**$3,591.27.** Once again deducting the additional taxes that the Debtor would have to pay as a loss

of the mortgage interest deduction ($1,152.00 per month, using the lower 2014 mortgage interest

number) and the increased taxes based on the loss of the real estate tax deduction ($228.08 per

month) would leave the Debtor with net monthly income of **$2,211.19** per month.

The IRS has filed a proof of claim in this case, asserting that $174,902.84 of its claim is

entitled to priority treatment under 11 U.S.C. § 507(a)(8). Proof of Claim No. 2-1. Bankruptcy

Code Section 1129(a)(9(C)(ii) requires regular installment payments in a Chapter 11 plan over a

period of not more than 60 months. 11 U.S.C. § 1129(a)(9)(C)(ii). This would require a Chapter

11 plan payment of **$2,915.05** per month, more than the Debtor's monthly net income, as

calculated above. Boiled down to its essence, if the Court uses the Debtor's gross income

number of $27, 368.58, the Debtor's substantial priority tax debts preclude any meaningful

distribution to the general unsecured creditors.

23

*(ii)     Using the U.S. Trustee's Figure of $31,951.92.*

Using the U.S. Trustee's higher income number of $31,951.92 (UST Ex. 6, Schedule I Line 2), on the other hand, the Debtor's income increases by **$12,993.59**. Using a 38.75% combined tax rate, his monthly net income would increase after the payment of taxes by **$7,958.57**. The Debtor's expenses would decrease by the combined amount of the two mortgages, $6,250.00, for a total positive increase in net income of **$14,208.57** ($7,958.57 + $6,250.00).[8] When applied against the Debtor's stated Schedule J monthly net income (-$7,810.01), this would result in positive monthly net income of **$6,398.56**. Once again deducting the additional taxes that the Debtor would have to pay as a loss of the mortgage interest deduction ($1,152.00 per month, using the lower 2014 mortgage interest number) and the increased taxes based on the loss of the real estate tax deduction ($228.08 per month). This would leave the Debtor with net monthly income of **$5,018.48** per month.

Deducting the IRS Chapter 11 plan payment of $2,915.05 per month, this would leave **$2,013.43** per month after payment of the IRS priority claim. The Debtor also would have a minimum quarterly fee to the U.S. Trustee of $325.00 per quarter, or **$108.33** per month, leaving **$1,995.10** in net monthly income. *Chapter 11 Quarterly Fees*, The United States Department of Justice, (Jan. 1, 2008), https://www.justice.gov/.../revised_ch11_qfee_sch.[9]

---

[8] *See In re Perelman*, 419 B.R. 168, 178 (Bankr. E.D. N.Y. 2009) ("Income made available to debtors as a result of surrendering encumbered assets are properly considered as part of a totality of circumstances analysis under § 707(b)(3)(B)"); *In re Goble*, 401 B.R. 261, 277(Bankr. S.D. Ohio 2009) (courts have regularly dismissed Chapter 7 cases based on debtors' ability to pay "even where the genesis of the debtors' positive projected disposable income going forward was the postpetition surrender of a residence or other collateral and the resulting decrease in secured debt").

[9] The U.S. Trustee also uses the means test's local housing allowance of $2,139.00, whereas the Court's calculation uses the Debtor's actual housing number of $3,600.00. UST Ex. 4, Form 122A-2, Line 9a.The means test housing allowance number is not relevant to the inquiry here. The Court can, of course, determine that the Debtor's budget is unreasonable as a part of the analysis, but in this case, the Court does not find that $3,600.00 per month for a two-bedroom apartment in Alexandria is inherently unreasonable.

The IRS also asserts that $15,863.00 of its proof of claim is secured. Proof of Claim No.

2-1. This would have to be paid with interest to the IRS. Without calculating interest, the

principal alone would add another **$264.38** in monthly payments to the IRS ($15,863.00 divided

by 60), now leaving the Debtor with **$1,730.72** in net monthly income.

Further, although the Virginia Department of Taxation has not filed a proof of claim, we

can assume that the priority portion of its $20,000.00 debt (Debtor's Schedule E) is comparable

to the IRS priority claim, 81%.[10] The Debtor, therefore, would have to pay the Virginia

Department of Taxation's priority claim of $16,200.00 ($20,000.00 x .81) over 60 months for a

monthly Chapter 11 plan payment to the Virginia Department of Taxation of **$270.00.** This

would leave the Debtor with **$1,460.72** in net monthly income.

Thus, after payment of the IRS priority claim, the IRS secured claim, the U.S. Trustee's

fees, and the Virginia Department of Taxation priority claim, the Debtor would be left with

**$1,460.72** per month with which to pay his unsecured creditors – before factoring in the higher

legal fees that necessarily would be incurred in a Chapter 11 case. In *In re Crawley*, Judge

Mitchell of this Court noted:

> . . . as debtors' counsel correctly notes, chapter 11—because it was really designed
> for business reorganizations—is many times more expensive than chapter 13. The
> filing fee alone is roughly three times the filing fee for a chapter 13 case. 28
> U.S.C. § 1930(a)(1)(A) and (3). In addition, the debtors would be required to pay
> quarterly fees to the U.S. Trustee until their plan was complete. 28 U.S.C. §
> 1930(a)(6). Finally, because of the substantial additional tasks required in a
> chapter 11 case as compared with a chapter 13 case, the legal fees would likely be
> many multiples of what a chapter 13 debtor would have to pay.

*          *          *

---

[10] The total amount of the IRS claim is $215,114.71, and the IRS asserts that $174,902.84 is entitled to priority
under Section 507(a)(8). ($174,902.84 divided by $215,114.71 = 81%).

> In short, although the debtors' argument is not without a certain surface appeal, the court agrees with the majority of courts that have held that ineligibility for chapter 13 relief is not dispositive of a motion to dismiss for abuse under § 707(b). The court does agree that it is a factor to consider, at least when chapter 11 is not a practical alternative.

412 B.R. at 786-87. *See also In re Tropper*, No. 09-76151-WHD, 2010 WL 9012919, at *8 (Bankr. N.D. Ga. July 19, 2010) ("the majority view holds that a debtor's ineligibility for relief under chapter 13 is not dispositive of whether the case should be dismissed under section 707(b), but rather is only one factor to consider").

Multiplying the $1,460.72 in net monthly income times 60 (the expected life of the Debtor's Chapter 11 plan) would yield a total of **$87,643.20.** From this amount, the Court would have to factor in the administrative expenses of a Chapter 11 case. Using a plug-in number for legal fees of $30,000.00 for an individual Chapter 11 case, this would leave **$57,643.20** in funds available for the unsecured creditors.

The Debtor lists total unsecured debt of $238,298.00 on his Schedule F. UST Ex. 3, Schedule F. Using the IRS's proof of claim, the unsecured, non-priority portion of the IRS debt would be $24,348.87 ($199,251.71 - 174,902.84). Adding the unsecured, non-priority portion of the IRS debt to the Debtor's unsecured claims would total $262,646.87, resulting in a distribution to the unsecured creditors of **22%** ($57,643.20 ÷ 262,646.87). This is not an insignificant return to the unsecured creditors in a Chapter 11 case and is well within the range of returns in the cases cited above for a meaningful distribution to unsecured creditors in Chapters 11 and 13.

      *(iii)*    *Resolution of the Bonus Issue.*

The issue turns, then, on whether or not to include the Debtor's 2015 bonus in the calculation. This is a question that is based entirely on the facts and circumstances of a given

case, specifically, the likelihood of the Debtor's receipt of bonus income during the duration of a

hypothetical Chapter 13 (or here, Chapter 11) plan. *See In re Navin,* 548 B.R. 343, 351 (Bankr.

N.D. Ga. 2016) ("the Court . . . believes that significant annual bonuses are very likely for [the

Debtor]"); *In re Krawczyk*, No. 11-09596, 2012 WL 3069437, at *3 (Bankr. E.D. N.C. July 27,

2012) ("the male debtor's future bonuses, at this point, are too uncertain for the court to make a

finding that the male debtor has an ability to pay"); *In re Coates*, No. 10-41555MER, 2011 WL

5419676, at *5 (Bankr. D. Colo. Nov. 7, 2011) ("Given the Debtor's consistent receipt of

bonuses, the Court concludes bonus income should be considered in determining the Debtor's

monthly income"); *In re Jacob*, 447 B.R. 535, 544 (Bankr. N.D. Ohio 2010) ("Although as the

bonuses are not guaranteed, and can fluctuate year-to-year, an exact figure cannot be placed on

the amount future year-end bonuses would add to the Debtors' household income. Nevertheless,

it is apparent that such bonuses have the potential to provide a significant boost to the Debtors'

income"); *In re Daugherty*, 416 B.R. 582, 589 (Bankr. N.D. Tex. 2009) ("Although [the debtor]

has received bonuses from his employer and large tax refunds in the past, based on the evidence,

they cannot be expected to continue in the future.")

      In this case, the Debtor received bonuses in 3 of the last five years. In two of those years,

or forty percent of the time, he received no bonus at all. The Debtor testified credibly that he is

struggling at his firm and that he does not expect to receive a bonus this year (2016). He also

testified that the very substantial bonus of $175,000.00 in 2014 was a "one time" event, and he

does not expect it to be repeated. Further, in the Court's view, the question is not simply whether

the Debtor will receive a bonus this year. The question is whether the Debtor reliably can be

expected to receive a bonus in each of the five years of his hypothetical Chapter 11 plan. If he

fails to receive a bonus in any one of those years, as he did in two of the past five years, the plan will fail.

In the end, the Court is not convinced that the Debtor's bonus income is sufficiently reliable to be included in the calculation. Accordingly, the Court uses the Debtor's lower monthly income figure of $27,368.58. Using the Debtor's income number, there is no prospect of a meaningful distribution to unsecured creditors in this case. *See* Part II(D)(i), above. The Court, therefore, finds that the case is not an abuse considering the totality of the circumstances under Section 707(b)(3) of the Code.

**Conclusion**

For the foregoing reasons, it is **ORDERED**:

1.      The U.S. Trustee's Motion to Dismiss is denied.

2.      The Clerk will mail copies of this Memorandum Opinion and Order, or will provide cm-ecf notice of its entry, to counsel below.

Date: Aug 3 2016                /s/ Brian F. Kenney

                                         Brian F. Kenney

Alexandria, Virginia              United States Bankruptcy Judge

Entered on Docket: August 3, 2016

Copies to:

Daniel Todd Campbell
1612 Courtland Road
Alexandria, VA 22306
*Chapter 7 Debtor*

Gregory H. Counts, Esquire
Tyler, Bartl, Ramsdell & Counts, PLC
300 North Washington St. Suite 202
Alexandria, VA 22314-4252
*Counsel for the Chapter 7 Debtor*

Kevin R. McCarthy, Esquire
1751 Pinnacle Drive Suite 1115
McLean, VA 22102
*Trustee*

Bradley David Jones, Esquire
Office of the United States Trustee
115 South Union Street, Suite 210
Alexandria, VA 22314
*Counsel for the U.S. Trustee*